[No. B031439. Second Dist., Div. Two. Jan. 31, 1989.]

CAL-AMERICAN INCOME PROPERTY FUND II, Plaintiff and Appellant, v.
COUNTY OF LOS ANGELES et al., Defendants and Respondents.

**COUNSEL**

Baker & Ancel, Stephens, Berg, Lasater, Schulman & Rogers, Mark C. Ancel and Larry S. Dushkes for Plaintiff and Appellant.

De Witt W. Clinton, County Counsel, Albert Ramseyer and Orry P. Korb, Deputy County Counsel, for Defendants and Respondents.

OPINION

ROTH, P. J.—

I

STATEMENT OF THE CASE

Cal-American Income Property Fund II appeals from a decision by the superior court denying its request for a refund of property taxes. The issue raised is whether there was a change of ownership in the real property, within the meaning of Proposition 13, so as to permit a reassessment of its value and the attendant increase in property taxes.

II

FACTUAL BACKGROUND

The subject realty is a 137-unit apartment building which Cal-American, a limited partnership, purchased in 1974.

In May 1980, Cal-American agreed to sell the property to Convair Properties Corporation, conveying title in fee simple. The sales price was $7 million with Convair giving a down payment of $750,000. The remainder of the purchase price was covered in an all-inclusive trust deed carried by Cal-American which included the debts it owed on the existing first and second trust deeds.

The promissory note provided that from the close of escrow (July 18, 1980) until April 1, 1981, interest only would be paid monthly ". . . in an amount equal to the lesser of seven percent (7%) per annum of the unpaid principal or the 'net spendable cash' generated from the Property . . . ." Net spendable cash was defined as the profits generated by leasing the apartment units less expenses. After April 1, 1981, and continuing until July 18, 1985, or to when 80 percent of the cooperative units had been sold, whichever occurred first, the note was "payable, interest only, equal to seven per cent (7%) per annum on the unpaid balance plus the 'net spendable cash' of the Property, all of which payments shall be accrued and due and payable together with the entire principal balance of [the Promissory Note] upon the earlier of five (5) years from July 18, 1980 or until eighty percent (80%) of the individual stock cooperative units within the Property are sold."

The agreement had the typical indicia of a traditional sales transaction. For instances, all outstanding leases and rental agreements were transferred to Convair; Cal-American was required to convey "marketable and fee simple title" with title insurance; and $50,000 was set as liquidated damages in favor of Cal-American in the event of breach by Convair.

The purpose of sale was to permit Convair to convert the apartment building into a stock cooperative housing project. In a cooperative, title to the entire project is held by the cooperative corporation so that an individual purchases a unit therein by buying stock in the corporation.

An additional term of the purchase agreement provided Convair would retain Cal-American Management, Inc., an affiliate of Cal-American,[1] to manage the building. The management agreement referred, in several places, to Convair as the fee title owner of the building. A rider to the contract recited that all of Convair's obligations to pay management fees, costs, loan payments, and expenses were assumed by Cal-American.

Escrow on the sale was opened in May 1980. On July 18, 1980, Cal-American first conveyed title to the realty to its attorney, Sidney A. Hamburg, as "Trustee under Declaration of Trust dated July 8, 1980" who in turn conveyed title to Convair by a recorded grant deed. The same day, Convair, by 11 grant deeds, transferred title to fractional interests in the property to individual investors. Aggregated, those conveyances constituted 92.5 percent of Convair's interest. ■ ■■■ Each transferee executed a trust deed and assignment of rents in favor of Convair to secure the debt occasioned by the purchase.[2] In 1981, one of the transferees conveyed her interest to another party. The Internal Revenue Service permitted the investors to claim depreciation for the realty and to deduct the management

---

[1] The sole shareholder of Cal-American Management, Inc., was a general partner of Cal-American.

[2] County counsel has formally requested this court to take judicial notice of the Los Angeles County Recorder's recordation of these trust deeds as being official acts of the executive department. (Evid. Code, § 452, subd. (c).) Cal-American has opposed the request because these documents were introduced in neither the administrative proceedings nor the superior court action.

Judicial notice is permissible even if the matter has not heretofore been judicially noticed as long as each party is afforded a reasonable opportunity to present information relevant to the propriety of taking judicial notice and the tenor of the matter to be noticed. (Evid. Code, § 459; *People* v. *Terry* (1974) 38 Cal.App.3d 432, 439 [113 Cal.Rptr. 233] and cases cited therein.)

At bench, such opportunity has been afforded. Cal-American does not question the authenticity of the documents subject to the request. Moreover, in the proceedings below, references were made to the trust deeds, the foreclosure proceedings initiated thereon and the subsequent settlement of said litigation. In view of these factors, the request for judicial notice is granted.

fees paid to Cal-American Management, Inc., on their federal income tax returns.

Cal-American recorded the 1980 transaction with Convair as a sale on its accounting records and no longer claimed depreciation on the building.[3]

The Assessor for the County of Los Angeles determined the 1980 transactions constituted a change in ownership of the property and therefore reassessed its value from approximately $1.9 million to $6.3 million.

In July 1985, the accrued interest and principal became due on the promissory note executed by Convair. However, as the effort to convert the apartment building into a cooperative had not materialized, Convair was unable to make the payment. Cal-American initiated foreclosure proceedings. Ultimately, Cal-American paid money to the investors to whom Convair had sold fractional interests to settle the litigation; in turn, those investors quitclaimed title back to Cal-American so that Cal-American was once again the record owner of the realty.

## III

### PROCEDURAL HISTORY

Cal-American filed an application with the Assessment Appeals Board for the County of Los Angeles contesting the reassessment in property taxes. It contended that in the 1980 there had been no change of ownership of the apartment building because Cal-American had merely granted Convair an option to purchase the realty, an option which was never exercised, and that was the only interest transferred by Convair to its grantees.

The Assessment Appeals Board, after hearing testimony and examining documentary evidence, rejected Cal-American's claim and found there had been a change of ownership in 1980. It based its conclusion on the specific findings that ". . . since each of the investors [to whom Convair had transferred fractional interests] could sell, encumber, or will their interest, and stood to gain any profit derived should the project [to convert the building into a cooperative] have been completed, [each] did in fact own a beneficial interest. [¶] Further nowhere in any of the agreements . . . was the word 'option' or 'option to purchase' indicated."

---

[3] In December 1983, entries were made in Cal-American's records reversing that decision and reinstating its claim of ownership of the building.

Having exhausted its administrative remedies, Cal-American brought suit in the superior court. It explicitly abandoned its earlier theory that Convair had been granted only an option to purchase the realty. Instead, it urged there had been no transfer of ownership as only "bare legal title" had been conveyed to Convair and its grantees because the right to the beneficial use of the property remained in Cal-American.

The trial court examined the record of the administrative proceedings and took additional evidence. It affirmed the assessor's decision, finding ". . . that [Cal-American] conveyed legal and equitable title, including beneficial ownership, of certain real property to Convair, which in turn conveyed to certain individuals. [¶] That beneficial interest passed is clear in that, notwithstanding the transactional scheme, the buyers had as an incident of ownership the right to profit by way of increased value of the property." Cal-American appeals from that decision.

## IV

### DISCUSSION

Article XIII A, section 2 of the California Constitution, enacted as part of Proposition 13, permits reassessment of real property for property tax purposes when the realty changes ownership. Revenue and Taxation Code section 60 defines change of ownership as ". . . a transfer of a present interest in real property, *including the beneficial use thereof,* the value of which is substantially equal to the value of the fee interest." (Italics added.)

Cal-American contends there was no change of ownership in 1980 because the element of a transfer of the beneficial use of the property was lacking. On this appeal, its theory is that ". . . Convair acquired only legal title to [the property] and the *contingent* right to acquire ownership" (italics in original). Pointing to the low down payment given by Convair, the use of rental income to fix the amount due as interest on the note, and the management agreement with Cal-American's affiliate, Cal-American argues it retained all of the benefits which flowed from ownership of the property. We disagree. None of these factors are inconsistent with a change of ownership. The sale was structured so that Cal-American financed the bulk of the sales price through the creation of an all-inclusive trust deed; Convair would only be obligated to make interest payments for eight months and that amount could be satisfied by transferring to Cal-American the rental income generated by the property. No additional money would be due from Convair to Cal-American until either the conversion to a cooperative succeeded or until July 1985. These elements merely illustrate the sale was

structured to make the project financially attractive to investors who wished to speculate the building's value would rise if the conversion to a cooperative succeeded. Cal-American's continued presence, through the management agreement, both insured continued profit to it and relieved future investors of the burden of finding day-to-day management for the premises. Its retention of liability for some of the operating expenses was consistent with its role as a facilitator of an attractive real estate investment.

Equally without merit is Cal-American's attempt to equate Convair's failure to pay the principal and accrued interest on the promissory note on the maturation date with a failure by Convair to perform a condition precedent to obtaining full ownership of the building. That is not what the agreement provided. On its face, title passed to Convair in 1980 so that Convair's subsequent failure to meet the terms of the note merely gave Cal-American the right to pursue the remedies permitted when the purchaser/borrower defaults. Sellers commonly finance a substantial portion of the sales price, secured by the property sold. The fact the buyer later defaults and the seller enforces its security interest can not mean such transactions were not true changes of ownership.

While Cal-American and Convair could have fashioned an agreement which only created an option to purchase or solely transferred bare legal title or made Convair's acquisition of title contingent upon payment of the principal, that is not what occurred at bench. The documents were absolute on their face, containing no conditions, exceptions or reservations regarding transfer of full title. Convair was granted title in fee simple. The sales agreement and escrow instructions had all of the indicia of a traditional sale. Convair's sales to investors and one of those individual's subsequent conveyance to a third party were consistent with a change of ownership in 1980 because those transactions were grounded on the assumption Convair had the ability to convey a very particular incident of beneficial use, to wit, the right to share in the increase in the value of the property which would occur upon successful conversion to a cooperative. The parties' handling of the tax ramifications of those transactions further corroborated this interpretation.

Stated in another way, Cal-American conveyed full title to Convair in 1980, gambling the conversion to a cooperative would be a success so that Convair would be able to pay it the remainder of the $6.25 million purchase price plus accrued interest. The conversion did not materialize, Convair did not make the requisite payments, and Cal-American was forced to exercise its rights of foreclosure to regain title to the property. In light of these

circumstances, it is patent there was a change of ownership in 1980 permitting a reassessment of value for property tax purposes.

### DISPOSITION

The judgment is affirmed.

Compton, J., and Fukuto, J., concurred.

Appellant's petition for review by the Supreme Court was denied April 19, 1989.